OPINION OF THE COURT
Bellacosa, J.
The crux of the case against defendant, who was convicted of assault and robbery following a jury trial, was the accuracy of the victim’s identification. The dispositive issue on this appeal, here by leave of a Judge of this Court, is a claimed Brady violation consisting of failure of the prosecution to turn over requested potentially exculpatory material (Brady v Maryland, 373 US 83; People v Vilardi, 76 NY2d 67). We *283 conclude that a prejudicial violation was committed by the People and that the order of the Appellate Division affirming the judgment of conviction should be reversed and a new trial ordered.
L
Viewing the evidence in a light most favorable to the People, we note that between 3:30 and 4:00 a.m. on November 4, 1987, Orlando Quintero was walking home from work when he approached a group of young men congregated in front of the Prince George Hotel, located near Bellevue Hospital in Manhattan. As Quintero drew close, defendant Davis rose from a milk crate he was sitting on and threw it at the victim, who began to run away. About 10 men chased after him and beat him, in an attack lasting about seven minutes. They stole his jewelry, wallet and other belongings, and then fled into the hotel. Quintero promptly reported the incident to the police and was taken to Bellevue Hospital for treatment. One week later, Quintero returned to the hotel with police officers and identified four men — defendant Davis, Mark Hunter, Mark Sweeper and Albert Johnson — as among those who had attacked him. They were arrested and indicted for robbery and assault.
In June 1988, the indictment against Hunter was dismissed. According to the People’s Recommendation for Dismissal, signed by Assistant District Attorney Lee, they were induced to conclude that they could not prove the case against Hunter beyond a reasonable doubt because:
An "aided card” from the 13th Precinct indicated that Hunter was taken to Bellevue Hospital with an injury to his right knee at 12:54 a.m. on November 4.
• Bellevue records indicated that Hunter registered at the Bellevue emergency room at 2:04 a.m. and that he was seen at 5:30 a.m. and treated for an injured knee. He was released at 6:45 a.m.
• If a patient were called by a treating doctor after being registered and did not answer, the patient’s records would usually be marked with an "N/A”. *284 No such indication appears on Hunter’s medical records.
At appellant Davis’ Wade hearing, his counsel requested "that the District Attorney turn over [Hunter’s] hospital record”. The People, represented by Assistant District Attorney Lee, argued that Hunter’s medical record was not relevant to the identification of defendant and was not Brady material. Defendant’s counsel then requested a stipulation that Hunter was in the hospital at the time of the crime. Lee refused and stated that the hospital record did not conclusively establish that Hunter was actually in the emergency room at that time. Lee then said that the emergency room records indicated that Hunter was "registered at about midnight, I believe, and was treated at six a.m. But the hospital doesn’t keep records of where people are in between registration and treatment.” Davis’ counsel and Lee continued to haggle, leading the court to urge that they stipulate to the essential facts. Ultimately, the stipulation now at issue was agreed to, and provided "that Mark Hunter entered Bellevue Hospital at Midnight November 3rd to 4th, 1987, and received medical treatment at 6 a.m. on November 4, 1987 for a twisted knee.”
Appellant Davis and his remaining codefendants, Sweeper and Johnson, were tried together in July 1988. The only evidence presented by the defense was the stipulation, which was read to the jury by the court following an explanation of the legal significance of a stipulation. Defendant’s counsel attempted in summation to discredit the victim’s identification of all defendants, arguing from the premise that even the People acted on the belief that the victim may have misidentified Hunter.
Assistant District Attorney Lee’s summation emphasized that Quintero had made accurate identifications. The salient portion relating to the stipulation arising out of the Hunter hospital record is as follows:
"I’m sorry to disappoint [defendant’s counsel], but I’m going to tell you to look closely at that stipulation. Listen to the wording. Mr. Hunter registered at the hospital at Midnight. Mark Hunter was treated at six a.m. There is no record. The hospital cannot prove, defense counsel cannot show, no one can prove that he was in that hospital for those six hours, six hours for a twisted knee before he *285 even saw a doctor. * * * [T]he People have not stipulated to the fact that he was there for six hours and therefore we have a bad identification. The medical record would show he registered and then six hours later got treated, but there is nothing in that record about did he leave or not. You’ve all been in emergency rooms. There is no control over you. Once you register, you can walk out, you can come back, you can do whatever you want; they don’t care.
"I submit to you, ladies and gentlemen, Mark Hunter was there that night. He registered for a twisted knee. He got bored after a couple of hours. No doctor was coming, no nurse had seen him. There is no paper work to show he had talked to anyone. He got bored and he limped back, walked back to the Prince George Hotel. It’s a mere five blocks, a walk that would take him five, ten minutes at the most. * * *
"Ladies and gentlemen, I submit he was there, he got bored. It’s the middle of the night. He goes back to the Prince George to see what his friends are doing. What they’re doing is they’re hanging out. He hangs out with them. He takes part in a robbery with them. Later on, after things have calmed down, the police have left, he goes back to Bellevue and says now take a look at my knee, and he gets treated six whole hours later. * * * It took them six hours for a nurse even to see Mark Hunter. Where was he? Maybe he wasn’t there when his name got called the first couple of times.”
The jury was given the case around 1:30 p.m. and deliberated and heard readbacks until 10:00 p.m., and then again the next morning. On the first night of deliberations, the jury requested explanations of the charges and readbacks of various parts of Quintero’s testimony, including portions where he described the taking of his camera bag by Hunter. The next morning, the jury asked for another readback of the testimony relating to the camera bag. That afternoon it returned guilty verdicts against the three defendants for robbery and assault. Before us now is only the Appellate Division affirmance of the conviction against Davis. That Court concluded:
*286 "[E]ven if the undisclosed facts — which the People have acknowledged were known to the Trial Assistant — had been produced for use by the defense at trial, it is unlikely that a different result would have been reached in this trial. (See, People v Simonds, [140 AD2d 236, affd 73 NY2d 945].) In this context, we are significantly influenced by the fact that the jury was aware, through stipulation, that the complainant may have erroneously identified the former codefendant” (People v Davis, 160 AD2d 664, 664-665).
Hi
Material inaccuracies, which were allowed into the stipulation by the People, expanded the time frame between Hunter’s arrival at the hospital and the time he was treated. Furthermore, the failure to include in the stipulation the precise times of his registration and release is also the responsibility of the People. Finally, the stipulation did not disclose the information known to the prosecutor that if a patient waiting in the emergency room did not answer the call of a treating doctor, the patient’s record would usually be marked with an "N/A”. Hunter’s records contained no "N/A”. All the accurate, relevant data was in the "best evidence” hospital records and procedures in the People’s possession, known to the People but withheld. These features of the substitute modality — the stipulation — prompted and facilitated the eventual speculation fed to the jury that Hunter had more time than was actually so to leave Bellevue, commit the crime, and return.
Hunter’s hospital records and the hospital policy concerning "N/A” notations are "evidence favorable to an accused” within the scope of the Brady exculpatory material rule (Brady v Maryland, 373 US, at 87, supra; see also, People v Vilardi, 76 NY2d 67, supra), because to the extent Quintero misidentified Hunter, the likelihood of misidentification of defendant is affected. Furthermore, defense counsel’s pretrial "specific request” for "Brady material” concerning Hunter’s treatment in the emergency room put "the prosecutor on notice that there is particular evidence the defense does not have and believes to be important” (People v Vilardi, supra, at 73-74).
The People’s failure to comply accurately and completely *287 with this defense Brady demand, coupled with their affirmative substitution of the misleading stipulation, entitles appellant to a new trial. The People’s emphasis during summation on the erroneous time periods recited in the stipulation gave the jury a materially altered framework in which to evaluate the key issue of Davis’ identification. This is especially troublesome with regard to the speculation that maybe Hunter "wasn’t [in the emergency room] when his name got called the first couple of times” and "there is nothing in that record about did he leave or not”. This facet underscores the "reasonably possible” effect of this evidence on the jury in deliberating and resolving the central issue of the accuracy of the victim’s identification of any one of the original suspects arrested, including appellant. We conclude that there is a "reasonable possibility” that had the potentially exculpatory material been provided accurately and completely, the result of the trial might have been different.
We agree with the Appellate Division that the claimed Rosario issue was unpreserved. Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.
Chief Judge Kaye and Judges Simons, Titone and Hancock, Jr., concur; Judge Smith taking no part.
Order reversed, etc.